IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PHIL SILOS,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD CO.,<br><br>　　　　　　Defendant. | 8:23CV113<br><br><br>**MEMORANDUM AND ORDER** |

　　　　Plaintiff Phil Silos worked for defendant Union Pacific Railroad Co. for around two decades. His time there ended when his supervisor noticed him limping on the job in early 2020, a result of osteoarthritis in his left hip. Following a fitness for duty evaluation, Union Pacific issued restrictions that prevented Silos from returning to work, prompting Silos to file this disability discrimination suit. Now before the Court is Union Pacific's motion for summary judgment. For the reasons stated below, its motion will be granted in part and denied in part.

**BACKGROUND**

　　　　Union Pacific hired Silos as a trackman in 1998. (Filing No. 52 at 1). His responsibilities entailed clearing and maintaining railway track, including tasks like changing ties, cutting and changing rail, driving and pulling spikes, and carrying "OTM"—on-track material. (Filing No. 54-1 at 6). A written job description for "track laborer(s)" produced by Union Pacific indicates that employees working in that role must "perform[ ] the essential job functions in a safe and effective manner." (Filing No. 53-3 at 2).

　　　　Silos' job responsibilities shifted over time. In 2011, he became a backhoe operator. (Filing No. 54-1 at 7). The functions of that role included replacing railroad ties, cutting grade, setting panels, installing switches, retrieving track materials for other members of his "gang," and

servicing his machine. (Filing No. 54-1 at 7). He bid into a track inspector position around one year later. (Filing No. 54-1 at 7). Union Pacific abolished the track inspector position shortly thereafter, so Silos returned to the backhoe operator position. (Filing No. 54-1 at 7). Silos testified that, even while working as a backhoe operator, he was expected to perform the functions of the trackman position—in his words, backhoe operators "still have to get out and help" maintain the track. (Filing No. 54-1 at 6, 7).

By March 2017, Silos was no longer working for Union Pacific.[1] (Filing No. 59-2). He sought treatment for pain in his left hip around that time from his primary care provider, Dr. Lindley. (Filing No. 54-1 at 10). Silos weighed 355 pounds and stood five feet, nine inches tall, meaning he was "morbid[ly] obes[e]." (Filing No. 54-11 at 9). Medical records reflect that the onset of that pain was "gradual" and "ha[d] been occurring in a persistent pattern for 4 months." (Filing No. 54-11 at 13). Silos reported that the pain was "aggravated by physical activity, sitting and lying on [the] affected side." (Filing No. 54-11 at 13). Associated symptoms included "limping, stiffness, catching, locking and decreased range of motion." (Filing No. 54-11 at 13). An X-ray revealed osteoarthritis in Silos' left hip. (Filing No. 54-11 at 14); (Filing No. 54-1 at 10). Dr. Lindley completed a "Statement of Sickness" form for the Railroad Retirement Board indicating that Silos "wasn't able to work" at that point but estimated that he would be able to return in two weeks. (Filing No. 54-11 at 42); (Filing No. 54-7 at 6).

Silos followed up with Dr. Lindley around one month later. (Filing No. 54-11 at 9); (Filing No. 54-1 at 10). He "present[ed] for paperwork completion," seeking "UPRR sickness leave." (Filing No. 54-11 at 9). Though Silos "want[ed] [a] hip replacement," Dr. Lindley advised that Silos "need[ed] to lo[se] weight" first. (Filing No. 54-11 at 9). In late May, Silos sought a "[r]echeck" of his UPRR "sickness leave" paperwork from Dr. Lindley. (Filing No. 54-11 at 5). Silos "tried to get sickness leave" from Union Pacific but was instead given "unemployment." (Filing No. 54-1 at 11). As far as treatment for his hip pain, Silos had gastric bypass surgery at some point (Filing No. 54-1 at 11) and underwent physical therapy for "[a] couple of months."

---

[1] Silos "was not working at Union Pacific" at that time "due to a matter not related to [his] hip or physical condition." (Filing No. 59-2 at 2).

2

(Filing No. 54-1 at 11). Silos saw Dr. Lindley for a final time in early 2018, seeking treatment for low back pain. (Filing No. 54-11 at 4).[2]

Silos returned to Union Pacific in 2019 and resumed working as a backhoe operator. (Filing No. 59-2 at 2). That is, until late 2019, when he was "disqualified" from operating his machine. (Filing No. 54-1 at 8). The reason for his disqualification is unclear. Silos testified it was because he fully removed a "switch rod" that was only supposed to be partially removed. (Filing No. 54-1 at 8). His supervisor, Tyrone Hoffmeister, testified that Silos was disqualified from operating a backhoe because he "drove over some signal apparatuses" in the yard, damaging untold "dollars' worth of signal material." (Filing No. 54-4 at 4).

As a result, Silos began operating a front loader after being disqualified as a backhoe operator. (Filing No. 54-1 at 8). During an average day, Silos was required to climb into and out of the front loader "more than 30 times," walk on uneven surfaces like the ballast surrounding the rail, and perform maintenance on his machine. (Filing No. 54-1 at 9). And as before, Silos was still occasionally called upon to perform trackman duties—even when operating a front loader, he "d[id] everything, just like being on the backhoe[.]" (Filing No. 54-1 at 8).

Silos was "pulled" from service in January 2020. (Filing No. 54-1 at 12). Silos testified that Hoffmeister told him Union Pacific was "sending [him] home" because of "[his] limp." (Filing No. 54-1 at 12). Silos responded that he was able to do his job, but Hoffmeister told Silos "he was looking out for [Silos'] safety." (Filing No. 54-1 at 12). In watching Silos "over the months [Silos had] worked for [him]," Hoffmeister saw that Silos had "some walking issues, stumbling, and the abilities to climb on certain equipment." (Filing No. 54-4 at 3).

According to Hoffmeister, Silos also told him he had a "bad hip" twice.[3] (Filing No. 54-4 at 3). The first was during a conversation between Silos and Hoffmeister—according to Hoffmeister, Silos "just stated he had a bad hip" but Hoffmeister "didn't ask any more questions" because he "didn't know how to help the employee at that time[.]" (Filing No. 54-4 at 3). The

---

[2] Silos does not, however, argue that his low back pain is a part of this case.

[3] At his deposition, Silos initially denied that he told anyone at Union Pacific that he had a bad hip. (Filing No. 59-1 at 5). He later testified that he did not "know if [he] said [he had a bad hip] or not" during the phone call, but "believe[d]" he did not. (Filing No. 59-1 at 6).

3

second was on a conference call with other managers and union representatives following Silos' disqualification from operating a backhoe. Silos "explain[ed] some other issues" he was having, one of them being "his bad hip." (Filing No. 54-4 at 4). Hoffmeister filled out a "Supervisor Initiated Fitness-For-Duty Request Form" conveying those details on January 10, 2020. (Filing No. 54-13 at 1). The fitness for duty process "entails a review of the pertinent and relevant medical records surrounding the reason for an employee's absence" to "determine if an employee is fit and able to work." (Filing No. 53-2 at 3, 4).

At the outset of that process, Silos told a Health and Medical Services department nurse that his "bad hip" was wearing out because of all the years he worked on the railroad. (Filing No. 54-1 at 12-13). Dr. John Charbonneau, one of Union Pacific's associate medical directors—through its Medical Services Department—requested Silos' medical records from the last two years, directed him to be evaluated by his primary care provider, and asked him to seek an orthopedic evaluation of his left hip. (Filing No. 52 at 6); (Filing No. 54-15; Filing No. 54-16; Filing No. 54-17).

Silos followed those directions. He was first evaluated by Dr. Jason Citta, a family medicine practitioner, on February 18, 2020. (Filing No. 54-1 at 15; Filing No. 54-19 at 12). Silos told Dr. Citta "that he had been taken out of service at work because he was seen limping and he needed a doctor's note to return to work." (Filing No. 54-8 at 6); (Filing No. 54-19 at 12). According to Silos, Dr. Citta advised him that at some point, Silos would "need a hip replacement" but did not recommend any treatment. (Filing No. 54-1 at 15). Dr. Citta completed a Statement of Sickness form indicating Silos was able to resume work the same day. (Filing No. 54-19 at 58). But Dr. Citta testified at his deposition that he did not know what Silos's job was or what his job duties were. (Filing No. 54-8 at 6). Instead, he reached the decision that Silos could safely return to work from "[o]nly [Silos's] report to [him] that he could do it." (Filing No. 54-8 at 6). Dr. Citta was "given no other information" to base his decision on. (Filing No. 54-8 at 6).

Around one month later, Silos was evaluated by an orthopedist—Dr. Mark McKenzie. (Filing No. 54-9 at 3); (Filing No. 54-20 at 3). Silos relayed that he had been experiencing intermittent "catching [in] the hip," which caused "sharp," knife-like pain. (Filing No. 54-20 at 3). Through Silos's work on the railroad and at a car detailing business he operated, he was "on his feet 12 to 14 h[ours] a day." (Filing No. 54-20 at 3). Silos also reported that the pain in his left hip

4

"sometimes aches," but that it was "not too severe" and rated the pain as "mostly at a 2 on a 0-to-10 scale." (Filing No. 54-20 at 3). Dr. McKenzie determined that Silos "has moderately severe primary osteoarthritis secondary to acetabulum femoral impingement of the cam type" in his left hip. (Filing No. 54-20 at 4). Silos was "almost touching bone to bone" at one place in that hip. (Filing No. 54-20 at 4).

Like Dr. Lindley, Dr. McKenzie stressed the need to lose weight. (Filing No. 54-9 at 6). To Dr. McKenzie, the "issue" was whether Silos would "be a candidate for a total hip replacement." (Filing No. 54-9 at 6). "[T]he more weight that [Silos]" could lose, "the safer and better off he would be in terms of risks with the surgery." (Filing No. 54-9 at 7).

*Un*like Dr. Citta, Dr. McKenzie did not opine on whether Silos could return to work, nor did Silos ask him to release him to return. (Filing No. 54-9 at 8). Dr. McKenzie believed that Silos was "functioning pretty well" on the day of the examination, but his belief was based only on Silos's self-reports. (Filing No. 54-9 at 7). Dr. McKenzie confirmed at his deposition that he was not able to give an opinion as to whether Silos was able to safely perform his job in March 2020 "[b]ased on th[e] information" he had at that time. (Filing No. 54-9 at 8). Dr. McKenzie testified, however, that Silos's symptoms "are associated with giving-way episodes; a sudden onset of sharp pain, and their leg will give out." (Filing No. 54-9 at 7-8). That could put someone like Silos "at risk for falls." (Filing No. 54-9 at 8). And in Dr. McKenzie's view, it was "possible" that a job requiring Silos to crawl, kneel, squat, and climb into and out of a front loader more than thirty times per day could exacerbate his condition. (Filing No. 54-9 at 8).

Silos submitted records from both examinations to Dr. Charbonneau. (Filing No. 54-3 at 6). Based on Dr. Charbonneau's review of those records, his "knowledge of patients with femoroacetabular impingement," Silos's comments to the HMS nurse about his hip, the "specific observation[s] from [Silos's] management," Silos's weight, and the fact that Silos spent a "considerable period of time each day on his feet" because of his "auto detailing business," Dr. Charbonneau issued work restrictions on March 30, 2020. (Filing No. 54-3 at 3). Those restrictions required Silos to avoid bending his knees, climbing, crawling, kneeling, standing for prolonged time, standing or walking on uneven surfaces, and walking for prolonged time. (Filing No. 54-14 at 1). Dr. Charbonneau did not speak with Silos before he issued the restrictions. (Filing No. 54-3 at 5).

5

Dr. Charbonneau testified that he imposed those restrictions because of a "concern that [Silos] might fall" and become injured given the "specific observations" from management that he had been "limping" or "staggering" at work. (Filing No. 54-3 at 3). Dr. Charbonneau "did not want to see [Silos] have an event at work secondary to his problem or any aggravation of that underlying problem in his left hip." (Filing No. 54-3 at 3). Silos's "risk of tripping, falling, losing his balance . . . in his work on even surfaces" was "the chief concern." (Filing No. 54-3 at 4).

Silos's managers determined they could not accommodate those restrictions. Hoffmeister, director of track maintenance Jeff Poppe, and AVP Engineering Russ Rohlfs concluded that Silos's restrictions "interfered with" and would "require removal of" the essential functions of Silos's job. (Filing No. 54-14 at 1, 2). Hoffmeister testified that Silos's job required Silos "to be by himself" when "he'd have to perform" duties that were prevented by his restrictions, and the railroad was not going to give the department "somebody else to do [Silos's] job that he needs to perform daily." (Filing No. 54-4 at 7).

Union Pacific communicated that decision to Silos in a letter dated April 8, 2020. (Filing No. 54-18). The letter advised Silos that his "supervising department was unable to identify a reasonable accommodation that will permit you to safely return to work in your assigned position or any job at the railroad." (Filing No. 54-18 at 1). Consequently, Silos was "referred to the UPRR Vocational Case Management Team (VCM) for assistance." (Filing No. 54-18 at 1). But Silos never sought reemployment or vocational services from Union Pacific. (Filing No. 54-1 at 16). Apart from asking to return to work in the same role he held. Silos did not make any other requests for an accommodation. (Filing No. 54-1 at 16).

Silos did, however, return to Dr. Citta in July 2020. Though Silos told Dr. Citta that he was "able to fulfill his duties," Silos wanted to "access" disability benefits from the Railroad Retirement Board because "his employer was not going to allow" him to return. (Filing No. 54-8 at 7, 8). So Silos directed Dr. Citta to complete a Supplemental Doctor's Statement to the Board. (Filing No. 54-22). In it, Dr. Citta said that Silos had no current response to treatment and was "unlikely to return to work." (Filing No. 54-22 at 1). But Dr. Citta merely took Silos at his word and did not do any independent analysis as to whether Silos could do his job at Union Pacific. (Filing No. 54-8 at 8). Dr. Citta and Silos did not "discuss" what the "ramifications" of completing

6

that form might be. (Filing No. 54-8 at 8). Silos nevertheless denied receiving benefits from the Railroad Retirement Board. (Filing No. 54-1 at 15).[4]

Silos filed this suit against Union Pacific around three years later. (Filing No. 1). He brought disability discrimination, improper medical inquiry or examination, and failure-to-accommodate claims under the Americans with Disabilities Act ("ADA"), as amended as by the ADA Amendments Act of 2018 ("ADAAA"), 42 U.S.C. § 12101, et seq.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

"On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party." *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* "The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmovant." *Barber v. C1 Truck Driver Training, LLC,* 656 F.3d 782, 791-92 (8th Cir. 2011) (quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson*, 643 F.3d at 1042 (quotation omitted).

---

[4] At his deposition, Silos suggested that he was evaluated a second time by both Dr. McKenzie and Dr. Citta at Union Pacific's expense. (Filing No. 54-1 at 15). The medical records before the Court show that while Silos sought further treatment for his hip pain from Dr. Citta in March 2022 (Filing No. 54-19 at 3), he was only seen by Dr. McKenzie once, in March 2020. (Filing No. 54-20). Silos also confirmed that he never asked Union Pacific to reevaluate him after it imposed his restrictions. (Filing No. 54-1 at 17).

## DISCUSSION

Union Pacific seeks summary judgment on all three of Silos's claims. (Filing No. 49). At the outset, the Court notes that Silos failed to oppose Union Pacific's arguments as to his improper medical inquiry and/or examination claim under § 12112(d)(4) in his brief. (Filing No. 61 at 1 n.1; Filing No. 57). He has therefore waived that claim. *See, e.g., Paskert v. Kemna-ASA Auto Plaza, Inc.,* 950 F.3d 535, 540 (8th Cir. 2020); *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 734 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."). The Court will consider Silos' two remaining claims in turn.

### 1. Disability discrimination

Section 12112(a) of the ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to" the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prevail on a claim under § 12112(a), Silos must show "(1) he was 'disabled,' (2) he was 'qualified,' and (3) the employer imposed work limitations because of his disability." *Sanders v. Union Pac. R.R. Co.,* 108 F.4th 1055, 1060 (8th Cir. 2024). "For purposes of [its] Motion," Union Pacific concedes that Silos is "disabled" under the ADA and that he "suffered an adverse employment action." (Filing No. 51 at 6).

But there is a threshold issue dividing the parties. Union Pacific contends that the *McDonnell Douglas* burden-shifting standard applies because Silos has no "direct evidence" of discrimination. (Filing No. 51 at 4); *see Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016) ("In the absence of direct evidence of discrimination, we apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to disability-discrimination claims of disparate treatment."). Under that framework, Silos would bear "the burden of establishing a prima facie case" of disability discrimination. *Id.* If he does, "[t]he burden of production then shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse action." *Id.* And "[f]inally, "the burden shifts back to the employee to show that the proffered reason was, in reality, a pretext for discrimination." *Id.*

Silos sees things differently. In his view, "the *McDonnell Douglas* framework does not apply" because there *is* direct evidence of discrimination—"Union Pacific admits that it prohibited Silos from working because of his limp." (Filing No. 57 at 7). "In other words, Union Pacific admits it took an adverse action against Silos because of his disability." (Filing No. 57 at 7).

8

Whether *McDonnell Douglas* applies in cases like these—where the employer placed restrictions "due to a perceived safety risk related to the employee's alleged disability"—appears to be an open question in the Eighth Circuit. *Jackson v. Union Pac. R.R. Co.*, 2021 WL 1726895, at *11 (S.D. Iowa Mar. 29, 2021); *see Oehmke*, 844 F.3d at 756 (declining to "reach [the defendant's] argument that in the context of the ADA a plaintiff may not use direct evidence to forgo the McDonnell Douglas burden-shifting framework"). But the Court need not answer it in this case.

Under either the *McDonnell Douglas* burden-shifting framework or the "direct-evidence framework," the plaintiff must show that they are "'otherwise qualified' for the position despite his or her disability[.]" *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 417 (6th Cir. 2020) (setting forth the plaintiff's burden "under the direct-evidence framework" that applies "[w]hen an employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision[.]"); *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 10 n.10 (6th Cir. 2012) ("Under either a circumstantial-evidence analysis (requiring application of the *McDonnell Douglas* burden-shifting framework) or a direct-evidence analysis (not requiring the burden-shifting framework), a plaintiff must show that he is otherwise qualified for the position."); *see also, e.g., Norcross v. Sneed*, 755 F.2d 113 (8th Cir. 1985). And for the reasons explained below, there is a genuine issue of material fact as to whether Silos was "otherwise qualified" at the time Union Pacific imposed restrictions. Thus, the outcome is the same under either framework—Union Pacific is not entitled to summary judgment.

a. Qualified individual with a disability

The parties dispute whether Silos is a qualified individual under the ADA. "To be considered a qualified individual under the ADA, an employee must '(1) possess the requisite skill, education, experience, and training for [her] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation.'" *Goosen v. Minnesota Dep't of Transportation*, 105 F.4th 1034, 1040 (8th Cir. 2024) (quoting *Scruggs v. Pulaski Cnty.*, 817 F.3d 1087, 1092 (8th Cir. 2016)). Union Pacific seems to agree that Silos possessed the requisite skill and expertise for the position. (Filing No. 51 at 6). It does not, however, believe that Silos could perform the essential functions of the job. (Filing No. 51 at 6).

9

"Essential functions," as distinguished from "marginal functions," are "the fundamental job duties of the employment position the individual with a disability holds or desires" and vary according to the job." *Id.* (quoting *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 810 (8th Cir. 2015)). To determine whether job duties are essential, the Court considers several factors, including

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

*Id.* The employer's judgment as to what constitutes an essential function is a "highly probative" factor. *Id.*

Union Pacific contends that the essential functions of Silos's "machine operator/trackman position" required him to regularly and repeatedly climb, bend, stoop, crawl, kneel, stand for long stretches, and walk on uneven surfaces. (Filing No. 51 at 6-7). And "[t]he ability to regularly perform all of those tasks in a safe manner was also considered an 'essential function' of Silos' position." (Filing No. 51 at 7). In support, Union Pacific points to a written job description for the track laborer position listing "practice safe work habits" as an essential job function. (Filing No. 53-3 at 2).

The problem with Union Pacific's arguments, in the Court's view, is that it has no evidence that Silos was unable to perform any of those essential functions at the time it imposed restrictions. Start with Union Pacific's rationale for initiating the fitness for duty process in the first place: Silos' statements to his supervisor that he had a "bad hip" and that supervisor's observation that Silos was limping on the job. (Filing No. 54-4 at 3; Filing No. 54-1 at 12). But neither of those facts *directly* relate to Silos' job duties. Put differently, Silos' self-assessment and limp have no bearing on whether he could regularly and repeatedly climb, bend, stoop, crawl, kneel, stand for long stretches, or walk on uneven surfaces. (Filing No. 51 at 6-7). Union Pacific, for its part, has not articulated which of those functions Silos was unable to perform. Nor can it point to any witnesses who saw Silos unable to do any of those things on the job.

Perhaps recognizing as much, Union Pacific relies instead on its characterization of Dr. McKenzie's testimony that Silos' "hip condition made him *susceptible* to falls or other sudden

10

losses of balance" and "*could* have been" worsened by Silos' "repetitive daily work tasks[.]" (Filing No. 51 at 11) (emphasis added). Those concerns about future harm, again, shed no light on the issue of whether Silos was able to perform the essential functions of his job at the time Union Pacific imposed the restrictions.

Most importantly, there is no evidence that the risk Union Pacific was most concerned about—Silos falling—ever came to pass. In fact, Silos says in his declaration that he "never fell at work because of [his] hip," nor did he ever have a "safety-related incident at work because of [his] hip." (Filing No. 59-2 at 2). This case is therefore unlike others where courts found a plaintiff not qualified as a matter of law. *See, e.g., Denson v. Steak 'n Shake, Inc.*, 910 F.3d 368, 370 (8th Cir. 2018) (noting that an ADA plaintiff who underwent hip replacement surgery "fell twice" on the job). As the Eighth Circuit has recognized, evidence that a plaintiff has successfully performed the required work in the past may be sufficient for a reasonable jury to conclude that the plaintiff could perform the essential functions of the position. *See Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc.*, 439 F.3d 894, 901-02 (8th Cir. 2006); *see also E.E.O.C. v. Hibbing Taconite Co.*, 720 F. Supp. 2d 1073, 1080-81 (D. Minn. 2010).

True, Hoffmeister testified that Silos had "some walking issues, stumbling, and the abilities to climb on certain equipment." (Filing No. 54-4 at 3). That general testimony, however, falls well short of showing that Silos was physically unable to perform any of his specific job duties. It is also notable that Hoffmeister did not initiate the fitness for duty process the first time Silos mentioned his "bad hip." (Filing No. 54-4 at 10). Hoffmeister even testified that nothing happened between Silos' first remark about his "bad hip" and the second that caused him concern about Silos' ability to do his job. (Filing No. 54-4 at 10).

None of the medical evidence is much help—to either side—on this issue, either. Dr. Citta, who released Silos to work with no restrictions, admitted he did not know what Silos' job duties were and that he made his decision based solely on what Silos told him. (Filing No. 54-8 at 6). Dr. Mackenzie was unable to opine as to whether Silos could safely perform his job in March 2020 "[b]ased on th[e] information" he had at that time. (Filing No. 54-9 at 8). Perhaps the best Union Pacific could muster[5] is Silos' statement to Dr. Lindley that his hip pain left him unable to work in

---

[5] It is also true, as Union Pacific points out, that "Dr. Citta completed a form that was submitted to the Railroad Retirement Board in which he stated that Silos was unable to work

2017. (Filing No. 54-11 at 10). But Silos made it at a time when he was not working for Union Pacific, three years before Union Pacific initiated the fitness for duty process. It is therefore of no consequence because "[t]he determination of whether an individual is qualified for purposes of the ADA . . . should be made as of the time of the employment decision." *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 568 (8th Cir. 2007). That is why Union Pacific's reliance on Silos' "admi[ssion]" that he could not physically perform his job duties "months after" it imposed restrictions or at the time he was deposed in 2024 also misses the mark. (Filing No. 51 at 8).

Unable to point to any particular job duties Silos was unable to perform, Union Pacific's real argument is that Silos was not qualified for safety reasons. (Filing No. 51 at 7). But that line of argument is both factually and legally deficient. As explained above, there is no evidence that Silos' hip condition caused him to fall or otherwise endanger himself or others on the job. From a legal standpoint, an employer's safety concerns are a poor fit in this context. Other courts in the Eighth Circuit have recognized that "an employer's safety concerns are not part of the prima facie case for disability discrimination." *Jackson v. Union Pac. R.R. Co.*, 2021 WL 1726895, at *15 (S.D. Iowa Mar. 29, 2021) (citing *Equal Emp. Opportunity Comm'n v. Wal-Mart Stores, Inc.,* 477 F.3d 561, 568 (8th Cir. 2007)). "Whether an individual poses a danger to himself or others is relevant for evaluating the employer's affirmative defense of direct threat," for which the employer bears the burden of proof. *Id.* Union Pacific has raised that defense here, and its safety related arguments are more properly analyzed under that framework.

In sum, viewing the record in the light most favorable to Silos and drawing all reasonable inferences in his favor, there is a genuine issue of material fact as to whether Silos was a qualified individual under the ADA. Union Pacific is therefore not entitled to summary judgment on Silos' § 12112(a) claim.

    b. **Direct threat**

Union Pacific also argues that it is entitled to summary judgment on Silos' disability discrimination claim through its direct threat affirmative defense. "A 'direct threat' is defined as

---

without restriction in his job and he was 'unlikely to return'" in July 2020. (Filing No. 51 at 7). But that evidence is not particularly probative to the Court. Silos told Dr. Citta that he was "able to fulfill his duties," but directed him to complete that form because he wanted to "access" disability benefits from the Railroad Retirement Board. (Filing No. 54-8 at 7, 8).

12

'a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.'" *Equal Emp. Opportunity Comm'n v. Drivers Mgmt., LLC*, 142 F.4th 1122, 1133 (8th Cir. 2025) (quoting 42 U.S.C. § 12111(3)). "The Supreme Court requires an individualized direct threat analysis that relies on the 'best current medical or other objective evidence' in order to 'protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear.'" *Id.* (quoting *Wal-Mart Stores, Inc.,* 477 F.3d at 571). "Specific factors to be considered include (1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." *Id.;* 29 C.F.R. § 1630.2(r). The employer bears the burden of proof. *See id.* Whether an employer has properly determined that a person poses a direct threat depends on "the objective reasonableness of [the employer's] actions." *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) ("[C]ourts should assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments[.]").

      Here, the Court does not doubt that Dr. Charbonneau made an individualized assessment of Silos' ability to safely perform the essential functions of his job. After all, Dr. Charbonneau "relied on evaluations by medical professionals and information contained in [Silos'] medical records to reach his decision." *Seals v. Union Pac. R.R. Co.*, 2025 WL 2061528, at *8 (D. Neb. July 23, 2025). That is so even though, as the Court pointed out above, there is no evidence that Silos' doctors had more than a "basic understanding of what duties [the track laborer/machine operator] job entailed and what its physical demands were." *Id.; see Jackson*, 2021 WL 1726895, at *20 (finding the defendant had satisfied its burden to show direct threat, while noting that there was no indication that the plaintiff's physicians understood his specific job duties). The fact that Dr. Charbonneau did not personally examine Silos does not weigh heavily against Union Pacific, either. *See Bingham v. Union Pac. R.R. Co.,* 693 F. Supp. 3d 1033, 1058 (D. Neb. 2023) (collecting cases).

      The Court questions, however, whether Union Pacific's decision itself was objectively reasonable. The § 1630.2(r) factors suggest that it may not have been. Union Pacific argues that the duration of the risk was "ongoing and open-ended" because Silos' doctors indicated that his condition would not improve unless he lost weight as a predicate to eventual hip replacement surgery. (Filing No. 51 at 22). Maybe so. But the remaining factors cut the other way. The nature

13

and severity of the potential harm caused by Silos' hip condition is, in the Court's view, not particularly high. To be sure, the Court has little trouble seeing how Silos could get hurt if he were to fall climbing into or out of his machine or while walking along uneven railroad ballast, for example. To prevail on its direct threat defense, however, Union Pacific must show that Silos posed a "*significant* risk." 42 U.S.C. § 12111(3) (emphasis added); see *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) (noting that the ADA "do[es] not ask whether a risk exists, but whether it is significant."); *Burroughs v. City of Springfield*, 163 F.3d 505, 508 (8th Cir. 1998). The severity of harm to Silos or others caused by the risk that Silos' hip could "catch" and cause him to fall does not, in the Court's view, meet that threshold, at least at the summary judgment stage.

The cases Union Pacific relies on help explain why. In *Bingham, Jackson, Carter, Carillo*, and *Vasquez,* the plaintiffs suffered a stroke, head injury, or seizure that created a risk of a future incapacitating event—like a seizure—on the job. *Bingham,* 693 F. Supp. 3d at 1038; *Jackson,* 2021 WL 1726895, at *2; *Carter v. Union Pac. R.R.* Co., 2022 WL 1909049, at *3 (D. Kan. June 3, 2022); *Carrillo v. Union Pac. R.R. Co.*, 2024 WL 3861374 (5th Cir. Aug. 19, 2024); *Vasquez v. Union Pac. R.R. Co.,* 2024 WL 4312257, at *10 (W.D. Tex. Aug. 26, 2024), *report and recommendation adopted*, 2024 WL 4314952 (W.D. Tex. Sept. 23, 2024). In each of those cases, the court found that the plaintiffs posed a direct threat at summary judgment. Their reasoning is consistent: the nature and severity of the harm caused by an employee suddenly losing consciousness on or near live railroad tracks is undoubtedly high. A track laborer, for example, "must operate machinery, sustain concentration, and respond to dangerous situations on the job"— none of that is possible if the employee becomes incapacitated. *Jackson,* 2021 WL 1726895, at *19. And in *Carillo,* the Fifth Circuit noted that the "nature and severity of potential harm was great" for a plaintiff who suffered a seizure because his "job required him to move or direct trains in an active railyard. He had to climb on those trains and balance on precarious catwalks as high as eighteen feet in the air. He—and everyone else in the railyard—would be significantly endangered if he suddenly lost consciousness." *Id.* at *4

To summarize those cases is to show how they do not apply here. The nature and severity of potential harm if Silos were to fall, even while "carry[ing] loads of heavy construction materials while walking on uneven ground," is significantly lower than in each of those cases. (Filing No. 61 at 8). Union Pacific's arguments to the contrary are not persuasive. It merely recites Silos' job

14

duties and emphasizes that the potential harm is "elevated" because Silos was required to work on and around train tracks. (Filing No. 51 at 22). Still, Union Pacific fails to explain what that potential harm actually is—beyond, of course, Silos falling down on the job. Simply put, the severity of potential harm caused by an employee losing consciousness and the severity of potential harm caused by an employee falling are vastly different. *See, e.g., E.E.O.C. v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000) ("The acceptable probability of an incident will vary with the potential hazard posed by the particular position: a probability that might be tolerable in an ordinary job might be intolerable for a position involving atomic reactors, for example . . .").

Questions of fact exist as to the likelihood and imminence of potential harm, too. The only evidence before the Court bearing on those factors is Dr. McKenzie's testimony that that Silos's symptoms "are associated with giving-way episodes" that could put someone like Silos "at risk for falls." (Filing No. 54-9 at 8). But the furthest Dr. McKenzie could go was opining that it was "possible" that a job requiring Silos to crawl, kneel, squat, and climb into and out of a front loader more than thirty times per day could exacerbate his condition. (Filing No. 54-9 at 8). That is not far enough: "[A] speculative or remote risk [of harm] is insufficient" in the direct threat context. *EEOC v. Browning-Ferris, Inc.*, 262 F. Supp. 2d 577, 587 (D. Md. 2002) (quoting 29 C.F.R. § Pt. 1630, App.). Further, there is no evidence quantifying how often Silos' hip "caught" or caused him to fall—indeed, the only evidence on that point is Silos' declaration stating that he never fell at work. (Filing No. 59-2 at 2). Further, as Dr. Lindley and Dr. McKenzie testified, the likelihood and imminence of potential harm could have been mitigated by weight loss and hip replacement surgery. That also suggests these factors favor Silos. *See Branham v. Snow*, 392 F.3d 896, 908 (7th Cir. 2004) (finding issues of fact on the direct threat defense where a "practice" available to an employee could "eliminate[ ] any imminence with respect to the risk of harm").

In sum, a genuine issue of material fact exists as to whether Union Pacific's actions in this case were objectively reasonable. It is therefore not entitled to summary judgment on its direct threat defense. That is not to say, however, that Union Pacific may not prevail on its direct threat defense at trial. The Court merely concludes that on this record, viewing the facts in a light most favorable to Silos, Union Pacific is not entitled to judgment on Silos' disability discrimination claim as a matter of law. *See, e.g., Just. v. Crown Cork & Seal Co.,* 527 F.3d 1080, 1092 (10th Cir. 2008).

15

2. **Failure to accommodate**

One loose end remains—Silos' failure to accommodate claim. To prevail, he must "establish both a prima facie case of discrimination based on disability and a failure to accommodate it." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). Union Pacific first argues that Silos' claim fails at the outset because he was not a "qualified individual." (Filing No. 51 at 25). The Court has already rejected that argument—there is at least a genuine issue of material fact as to that issue. So the Court proceeds to the merits of Silos' failure to accommodate claim.

"To determine whether an accommodation for the employee is necessary, and if so, what that accommodation might be, it is necessary for the employer and employee to engage in an 'interactive process.'" *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 906 (8th Cir. 2015). This interactive, accommodation-seeking process must be initiated by the disabled employee, who must alert his employer to the need for an accommodation and provide relevant details of his disability. *See id.* To show that an employer did not engage in an interactive process, the employee must prove (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *Id.*

Here, Silos' claim fails at the second factor. There is no evidence that Silos requested accommodations or assistance for his disability. He testified that he did not pursue Union Pacific's offer to help him get another job internally or externally. (Filing No. 54-1 at 16). He admitted that he did not seek reemployment or vocational services from Union Pacific in any other way. (Filing No. 54-1 at 16). Nor was he aware of any jobs that were open at Union Pacific that he would have been able to perform within his restrictions. (Filing No. 54-1 at 16). And most notably, he confirmed that he never made any request for accommodation apart from returning to his old job. (Filing No. 54-1 at 16). Those facts doom Silos' failure to accommodate claim as a matter of law.

Silos, for his part, does not seem to argue that he did request an accommodation or assistance. Instead, he faults Union Pacific for "not engaging in the interactive process in good faith" because it "did not talk with Silos about the ways in which he could have been accommodated," did not talk with Silos' doctors, or "consult with [his] union." (Filing No. 57 at

23). But that line of argument is backwards. The interactive process "must be initiated by the *disabled employee*, who must alert his employer to the need for an accommodation[.]" *Schaffhauser,* 794 F.3d at 906 (emphasis added). There is no evidence before the Court indicating Silos did so. His attempt to place the burden on Union Pacific effectively concedes that he did not.

What Silos really seems to be arguing is that because Union Pacific learned the nature of Silos' hip condition and imposed limitations through the fitness for duty process, Union Pacific should have taken the lead on accommodating him. Not so. For an employee to prevail on a failure to accommodate claim, "[t]he employer must know of both the disability *and the employee's desire for accommodations* for that disability." *Ballard v. Rubin*, 284 F.3d 957, 962 (8th Cir. 2002) (emphasis added) (quoting *Taylor v. Phoenixville School District*, 174 F.3d 142, 158-59 (3d Cir. 1999)). Mere knowledge of Silos' disability, then, is not enough. Union Pacific is therefore entitled to summary judgment on Silos' failure to accommodate claim. Accordingly,[6]

**IT IS ORDERED:**

1. Union Pacific's motion for summary judgment (Filing No. 49) is granted in part and denied in part, as set forth above.
2. The plaintiff's improper medical inquiry and/or examination and failure to accommodate claims are dismissed.
3. Union Pacific's opposition and objection to plaintiff's notice of supplemental authority (Filing No. 66) is overruled.

---

[6] After summary judgment briefing closed, Silos submitted a notice of supplemental authority including the EEOC's determination letter finding "reasonable cause to believe that [Union Pacific] discriminated against [Silos] based on disability." (Filing No. 65-1 at 2). The Court acknowledges that while "prior administrative proceedings are not binding in federal court," they "are admissible evidence." *Johnson v. Yellow Freight Sys., Inc.,* 734 F.2d 1304, 1312 (8th Cir. 1984) (McMillian, J., concurring in part and dissenting in part) (quoting *Chandler v. Roudebush,* 425 U.S. 840, 863 n. 39 (1976)). Nonetheless, the Court has not considered the determination letter in ruling on Union Pacific's motion. The determination letter contains no analysis and applies a standard different from the one the Court must apply, so the Court gave it no weight in making its "independent and de novo review" of Silos' claims. *See Metzsch v. Avaya, Inc.*, 2004 WL 7373023, at *1 (D. Neb. Aug. 31, 2004).

4. This matter is referred to the Magistrate Judge for case progression.

Dated this 7th day of November, 2025.

BY THE COURT:

_____
Susan M. Bazis
United States District Judge