**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

PHIL SILOS,

        Plaintiff,

v.

UNION PACIFIC RAILROAD
COMPANY,

        Defendant.

CASE NO. 8:23-cv-113

**DEFENDANT UNION PACIFIC
RAILROAD COMPANY'S TRIAL BRIEF**

Union Pacific submits this trial brief to clarify the elements of Plaintiff Phil Silos's ("Silos") ADA claim and Union Pacific's defenses to be presented at trial.

## I.    FACTUAL BACKGROUND

Union Pacific hired Silos in 1998, and by the time of the events most relevant to this action, he was a Track Laborer working in North Platte, Nebraska.  As a Track Laborer, Silos was required to perform a range of physical tasks relating to clearance and maintenance of railway track, including changing ties, cutting and changing rail, driving and pulling spikes, and frequently carrying various on track materials. Although Silos eventually began operating certain track maintenance machines, in those machine operator roles he still had to frequently exit the machines and assist with Track Laborer responsibilities.

Silos operated a backhoe until December 2019 when he had an accident and caused significant property damage.  After being disqualified from backhoe operation, he moved to operating a front end loader. In that position, in addition to continuing to assist with Track Laborer tasks, Silos typically had to climb in and out of the front end loader

more than 30 times a day, had to do a wide range of tasks to repair and maintain the front end loader (which often required crawling under the machine), and had to frequently walk on uneven surfaces, climb, and crawl.   In addition to the risk related to his operating the front loader, in performing Track Laborer job duties Silos worked around moving machinery and near live rails  Given that his position was considered safety-sensitive, Silos' ability to do his job safely was also an "essential function" of his position.

On January 10, 2020, Silos' supervisor at Union Pacific, Tyrone Hoffmaster (Senior Manager, Track Maintenance), removed Silos from service and referred him for a fitness-for-duty ("FFD") evaluation after observing Silos limping and stumbling on the job and having difficulty climbing on and off equipment, and after Silos's latest report to him that he had a "bad hip."  When Hoffmaster pulled Silos from service and referred him for an FFD evaluation, he was concerned both for Silos' safety and the safety of those working around him.  Silos admits that the only reason he was ever given for the FFD was for his safety and the safety of his co-workers.

Dr. John Charbonneau, one of Union Pacific's Associate Medical Directors, conducted and ultimately issued restrictions as a result of the FFD evaluation process. Dr. Charbonneau is an occupational medicine doctor with over 30 years of experience working in the railroad industry and is very familiar with the Track Laborer position at Union Pacific, having conducted numerous FFD evaluations of individuals holding that position and having observed Track Laborers perform their jobs at Union Pacific.

As part of the FFD evaluation process, Union Pacific's Health and Medical Services Department ("HMS") — per Dr. Charbonneau's direction — requested Silos' primary care medical records for the prior two years, asked Silos to get a new evaluation

2

from his primary care provider, and asked him to work through his primary care provider to get examined by an orthopedic specialist.

Following the request from HMS, Silos saw Dr. Jason Citta, a family medicine practitioner in North Platte, on February 18, 2020 — the first time he had ever been seen by Dr. Citta. Silos told Dr. Citta that he had recently been removed from service at work for limping and having hip pain and was seeking a "doctor's note to return to work." Silos provided no information to Dr. Citta about his job or the responsibilities it regularly entailed, he did not know that Silos operated equipment in his job, and his only basis for concluding that Silos could safely perform the functions of his job was Silos' own assurances that he "could do it." Dr. Citta signed a basic form for Silos indicating he could return to work the same day as the examination, but he never "independently evaluated" whether Silos could safely perform his job duties at Union Pacific.

Silos then saw Dr. Mark McKenzie, an orthopedist at Great Plains Health in North Platte, who examined Silos on March 17, 2020. Dr. McKenzie personally examined Silos. On the date of that examination, Silos weighed 325 pounds, rating as morbidly obese. Based on his examination, Dr. McKenzie concluded that Silos had "severe primary osteoarthritis of his left hip" and a "cam type acetabular femoral impingement." Silos' left hip joint was almost "bone on bone" at that point. Silos reported intensifying pain after walking around all day and while climbing stairs, and described the periodic catching in his hip as creating a pain that was "very sharp like a knife." Dr. McKenzie recommended an anti-inflammatory drug and weight loss as an essential predicate to eventual hip replacement surgery.  When he examined Silos in March 2020, Dr. McKenzie was not attempting to evaluate whether Silos could safely perform his job at Union Pacific, and he

3

had no basis beyond Silos' own self-reporting for knowing how Silos' symptoms may have affected his work functionality at the time.

In reaching an ultimate decision on Silos' FFD evaluation, Dr. Charbonneau considered: (a) medical records from Silos' primary care provider(s); (b) physical examination findings from orthopedic specialist Dr. McKenzie; (c) his own medical knowledge regarding patients with femoroacetabular impingement and osteoarthritis; (d) Silos' overall physical condition, including his excessive weight; (e) Silos' reports to HMS Nurse Weinman that his work at Union Pacific was causing deterioration in his hip condition; (f) the essential functions of Silos' position; and (g) reports from Union Pacific management concerning direct observations of and safety concerns about Silos on the job. Dr. Charbonneau knew that Silos had been observed limping and staggering and had reported on at least two occasions that he had a "bad hip" related to his disqualification from the backhoe and assignment to the front loader.

Based on his evaluation and determinations, Dr. Charbonneau issued the following medical restrictions to Silos on or about March 30, 2020: no prolonged walking or standing; no walking or standing on uneven surfaces; no squatting/bending knees, kneeling, climbing, or crawling; and the work restrictions are ongoing but can be reassessed if there is adequate medical documentation of substantial improvement in Silos' health condition.  The primary factor in Dr. Charbonneau's issuance of the medical restrictions was concern that Silos could fall on the job and sustain injury — and/or cause injury to others — due to his compromised stability and mobility; secondarily, even absent such an accident, Silos could well further damage his health by continuing to work without treatment of his degenerative hip condition.

4

Silos admits that with the medical restrictions in place, he could not perform all the required duties of the Track Laborer position. Union Pacific reached out to Silos and offered him assistance in finding an alternative position with Union Pacific; however, Silos failed to respond to the offer of assistance and did nothing to seek reemployment with or vocational assistance services from Union Pacific after he received medical restrictions in March 2020. Other than asking that the medical restrictions be removed so that he could return to his Track Laborer position, Silos never sought any accommodation from Union Pacific. Silos never got his hip replaced, and so never asked anyone at Union Pacific to be reevaluated to see if he could resume his old position. Silos admitted at his deposition that he could no longer perform the duties of his Track Laborer position due to being in too much pain from his hip.

Silos' medical expert witness, Dr. Kevin Trangle, acknowledges that Silos' treating providers indicated that he could not receive a hip replacement unless he lost significant weight. Dr. Trangle does not opine that Silos could have safely performed his job at Union Pacific when he was removed from service, but rather only that he should have been subjected to a functional capacity examination or functional field evaluation during his FFD.

## II.     <u>PROCEDURAL BACKGROUND</u>

Silos brought disability discrimination, improper medical inquiry or examination, and failure-to-accommodate claims under the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101, et seq. Union Pacific moved for summary judgment on all three of Silos' claims. At the outset, the Court noted that Silos failed to oppose Union Pacific's arguments as to his improper

5

medical inquiry and/or examination claim under § 12112(d)(4) in his brief, and he therefore waived that claim. The Court also granted summary judgment to Union Pacific on Silos' failure-to-accommodate claim, finding that there was no evidence that Silos requested accommodations or assistance for his disability. He testified he did not pursue Union Pacific's offer to help him get another job, he admitted he did not seek reemployment or vocational services from Union Pacific in any other way, he was not aware of any open jobs at Union Pacific that he could perform within his restrictions, and he confirmed he never made any request for accommodation apart from returning to his old job.

The Court denied summary judgment on Silos' § 12112(a) disability discrimination claim, concluding there is a genuine issue of material fact as to whether Silos was a qualified individual under the ADA. The Court also denied summary judgment on Union Pacific's direct threat affirmative defense, concluding that a genuine issue of material fact exists as to whether Union Pacific's actions were objectively reasonable, but expressly noted that Union Pacific may still prevail on its direct threat defense at trial.

Accordingly, Silos's sole claim remaining for trial is disability discrimination claim under § 12112(a). Union Pacific's business necessity and direct threat affirmative defenses are also before the jury in this trial.

### III.   LEGAL ANALYSIS

### A.   The Elements of Silos's ADA Disability Claim

The ADA provides that employers shall not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and

other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prevail on a claim under § 12112(a), Silos must show "(1) he was 'disabled,' (2) he was 'qualified,' and (3) the employer imposed work limitations because of his disability." *Sanders v. Union Pac. R.R. Co.*, 108 F.4th 1055, 1060 (8th Cir. 2024). For purposes of this trial, Union Pacific concedes that Silos is disabled under the ADA and that he suffered an adverse employment action.

**B.    Silos Cannot Establish He Was a "Qualified Individual"**

Silos cannot establish he was a "qualified individual" as that term is defined under the ADA. Although the Court found a genuine issue of material fact on this question at summary judgment, the evidence to be presented at trial will fully establish that Silos was not qualified.

"To be considered a qualified individual under the ADA, an employee must '(1) possess the requisite skill, education, experience, and training for [her] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation.'" *Goosen v. Minnesota Dep't of Transportation*, 105 F.4th 1034, 1040 (8th Cir. 2024) (citations omitted).  Union Pacific agrees that Silos possessed the requisite skill and expertise for the position. It does not, however, believe that Silos could perform the essential functions of the job.  Moreover, because the court dismissed Silos's reasonable accommodation claim, Silos must prove he can perform the essential functions of the job without considering a reasonable accommodation.

The first step in analyzing the qualification prong is to determine the "essential functions" of the job in question. "Essential functions are 'the fundamental job duties of the employment position.'" *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911,

923 (8th Cir. 2018) (quoting *Walz v. Ameriprise Fin., Inc.*, 779 F3d 842, 845 (8th Cir. 2015)). Relevant factors include "(1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs." *McNeil v. Union Pacific Railroad Co.*, 936 F.3d 786, 789-90 (8th Cir. 2019) (quoting *Dropinski v. Douglas Co.*, 298 F.3d 704, 707 (8th Cir. 2002)). "Although not conclusive, [the Eighth Circuit] consider[s] the employer's judgment of what constitutes an essential function 'highly probative.'" *Scruggs v. Pulaski Cnty., Ark.*, 817 F.3d 1087, 1093 (8th Cir. 2016) (citing *Kammueller v. Loomis, Fargo & Co.*, 383 F3d 779, 786 (8th Cir 2004)).

The essential functions of Silos' Track Laborer position undisputedly required him to regularly and repeatedly climb, bend, stoop, crawl, kneel, stand for long stretches, and walk on uneven surfaces. The ability to regularly perform all of those tasks in a safe manner was also considered an "essential function" of Silos' position. His supervisor ultimately saw empirical evidence of Silos's hip issue in the form of Silos' limping and staggering and struggling to climb on the job — and Silos himself reported that he had a "bad hip." When that prompted a manager referral to the FFD process, Silos promptly told HMS Nurse Weinman that his work at Union Pacific was causing his hip to wear out.

Neither of the external doctors who examined Silos during the FFD process rendered an informed, independent, credible opinion that he could safely return to his Track Laborer position. Dr. Citta, a family physician with no occupational medical credentials, casually signed off on Silos going back to work based solely on self-serving

8

representations from Silos and without any credible information about what his job at Union Pacific actually required. Dr. Charbonneau based the functional work restrictions on the objective evidence set forth in Silos' medical records, Silos' admissions that his "bad hip" was caused and being exacerbated by working for Union Pacific, the reports from Silos' supervisors of limping, stumbling, and staggering on the job, and Dr. Charbonneau's reasonable medical judgment obtained through his years of experience. While Silos, his expert, and his counsel now try to protest that he was somehow perfectly capable of performing his physically demanding job at Union Pacific in mid-2020, Silos admits that with the medical restrictions in place, he was unable to perform the "essential functions" of his Track Laborer position.

Based on the information available in March 2020, it would have been reckless for Dr. Charbonneau (on behalf of Union Pacific) not to issue the medical restrictions for Silos. Employers are "entitled to rely on [medical] recommendations that [an employee] was not able to safely perform an essential function of [the] job." *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 969 (7th Cir. 2020) (quoting *Stern v. St. Anthony's Health Center*, 788 F.3d 276, 294 (7th Cir. 2015)). The only evidence that Silos offers to show he was qualified is his own self-serving statements and an opinion from his designated expert, Dr. Kevin Trangle. However, Dr. Trangle's post hoc opinion is nothing more than an uninformed quibble with the way Dr. Charbonneau conducted the FFD.

### C.    The Evidence Supports Union Pacific's Direct Threat and Business Necessity Defenses.

Even if the jury finds that Silos has established his disability discrimination claim — which the evidence does not support — Union Pacific is independently entitled to prevail on its direct threat and business necessity affirmative defenses.

9

1.    <u>Direct Threat</u>

An employer is entitled to judgment if the employee posed a "direct threat" to himself or others. *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007). "Direct threat" is defined as "a significant risk of substantial harm to the health and safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). To establish its direct threat defense, Union Pacific must show it made: (1) an individualized assessment of Silos' ability to safely perform the essential functions of his job, and (2) relied on "reasonable medical judgment" that relies on current medical knowledge or the best available objective evidence. 29 C.F.R. § 1630.2(r).

The Supreme Court requires an individualized direct threat analysis that relies on the "best current medical or other objective evidence" in order to "protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear." *E.E.O.C. v. Drivers Mgmt., LLC*, 142 F.4th 1122, 1133 (8th Cir. 2025). "Specific factors to be considered include (1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." *Id.*; 29 C.F.R. § 1630.2(r).  The employer bears the burden of proof on this defense.

An employer's direct threat determination must also be "appropriately based on objective evidence and reasonable medical judgment." *Burroughs v. City of Springfield*, 163 F.3d 505, 508 (8th Cir. 1998). An employer need not show its direct threat decision was "correct," only that it relied "on an 'objectively reasonable' opinion." *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 309 (6th Cir. 2015).

10

a.  Dr. Charbonneau Conducted an Individualized Assessment

The Court in its summary judgment order did not doubt that Dr. Charbonneau made an individualized assessment of Silos' ability to safely perform the essential functions of his job. After all, Dr. Charbonneau "relied on evaluations by medical professionals and information contained in [Silos'] medical records to reach his decision." *Seals v. Union Pac. R.R. Co.*, 2025 WL 2061528, at *8 (D. Neb. July 23, 2025) (citations omitted). The fact that Dr. Charbonneau did not personally examine Silos does not weigh heavily against Union Pacific. *Bingham v. Union Pac. R.R. Co.*, 693 F. Supp. 3d 1033, 1058 (D. Neb. 2023).

Dr. Charbonneau's FFD evaluation of Silos was appropriately individualized. Dr. Charbonneau requested and reviewed Silos' available personal medical records for the timeframe in which he had been experiencing hip pain. He had Silos get current medical examinations from multiple external doctors, including an orthopedic specialist, and he considered the results of those personal examinations. He considered the requirements of Silos' particular position with Union Pacific and the information he received from Silos' supervisor about his direct observations of Silos physically struggling to perform those tasks. Nothing about the process suggests that Dr. Charbonneau based his ultimate medical judgments on abstract stereotypes instead of information specifically related to Silos, his health circumstances, and the safety risks posed by those circumstances in light of the specifics of his safety-sensitive job.

b.  The Section 1630.2(r) Factors Support Union Pacific's Direct Threat Affirmative Defense.

**Duration of the Risk.** As for duration of the risk, it is clear from Silos' personal medical providers, including Dr. McKenzie, that his hip was not going to improve unless

11

he lost substantial weight and was able to either rehabilitate his hip or (most likely) get a hip replacement. The duration of the risk was ongoing and open-ended.

**Nature and Severity of the Potential Harm.** The nature and severity of the risk was significant considering Silos' own description of his job, which required — among other things — constantly climbing in and out of the front loader "more than 30 times" per day; walking on uneven surfaces including ballast on the side of the rail and over rails; often operating, working on, and around (and sometimes under) heavy machinery; and (on days when he was also called upon to perform Track Laborer work) changing railroad ties, spiking, digging, "carrying a lot of stuff," and similarly intensive physical duties. The potential harm was also elevated because Silos was required to constantly work on and around train tracks and moving equipment.

**Likelihood and Imminence of Potential Harm.** Regarding likelihood and imminence of the potential harm, Dr. McKenzie's diagnosis and testimony confirm that as of March 2020, Silos was very much at risk of having his left leg give out or otherwise losing his balance because of his hip condition. Given that Silos' job required him to climb on and off machinery dozens of times a day and constantly kneel, crawl, and walk on uneven ground (sometimes while carrying heavy track maintenance and repair materials), the risk of him suffering such an accident was by no means remote or hypothetical.

The Court at summary judgment expressed concern that this case differs from the stroke and seizure cases in which the direct threat defense has been found as a matter of law. The Court acknowledged that "the nature and severity of potential harm if Silos were to fall, even while 'carry[ing] loads of heavy construction materials while walking on uneven ground,' is significantly lower" than cases involving seizure or sudden

12

incapacitation. (Dkt. No. 71 at 14). Union Pacific respectfully submits, however, that the evidence shows that Silos was at significant risk of falling due to his hip condition and he was engaged in inherently dangerous job duties that were he to lose his balance he or even others could be seriously injured or killed.  What is more, Silos himself admitted that the job was causing his hip injury and Dr. Charbonneau could not in good conscience send him back to the work environment to cause further injury.  The ADA "requires only that the employer rely on an 'objectively reasonable' opinion, rather than an opinion that is correct." *Michael*, 808 F.3d at 309 (citing *Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007)). The Court's role is to ensure the "decision-maker has reasonably considered and relied upon sufficient evidence specific to the individual and the potential injury, not to determine on its own which evidence it believes is more persuasive." *Knapp v. Northwestern Univ.*, 101 F.3d 473, 484 (7th Cir. 1996).

              c.     The Jury's Role is Circumscribed—It Does Not Retry the Medical Decision.

A critical instruction the Court should give — and which Union Pacific has requested — is that the jury's function in evaluating the direct threat defense is not to make its own de novo medical determination about whether Silos posed a direct threat. The factfinder "does not independently assess whether it believes that the employee posed a direct threat" because its "role is to determine whether the employer's decision was objectively reasonable." *Jarvis*, 500 F.3d at 1122. The law requires only that the employer rely on an "objectively reasonable" opinion rather than a correct one, because "in many cases, the question whether one doctor is right that an employee can safely perform his job functions, or another doctor is right that the employee cannot, will be

13

unknowable — unless the employer runs the very risk that the law seeks to prevent." *Michael*, 808 F.3d at 309.

The jury should not be permitted to substitute its lay judgment — rendered after the fact, with the benefit of hindsight, in a courtroom, with no exposure to the active railroad environment — for the real-time medical judgment of an experienced occupational physician evaluating a safety-sensitive position. The law does not invalidate Dr. Charbonneau's thoughtful and objectively-based medical and safety risk management determinations solely because Silos and his expert can now concoct and conjure hypothetical reasons to second-guess them. *Jarvis*, 500 F.3d at 1122.

Numerous courts applying these standards to Union Pacific FFD evaluations have concluded that it is objectively reasonable for Union Pacific's staff of experienced occupational medicine physicians to make health and safety-related decisions regarding medical restrictions for employees in safety-sensitive positions. In *Bingham*, a Union Pacific Associate Medical Director's reliance on employee medical records and long-used medical guidelines was "within his reasonable medical judgment," and "no reasonable jury could find that Union Pacific's reliance on [them] ... was anything less than objectively reasonable." *Bingham v. Union Pac. R.R. Co.*, 2023 WL 6196875, at *19 (D. Neb. Sept. 22, 2023).  In *Jackson*, the court held that "no reasonable jury could find Union Pacific's direct threat determination was not objectively reasonable" when it relied on its doctors' evaluations, the plaintiff's medical records, and widely-used industrial medical guidance. *Jackson v. Union Pac. R.R. Co.*, 2021 WL 1726895, at *19-20 (S.D. Iowa Mar. 29, 2021). More recently, in *Carrillo v. Union Pacific Railroad Company*, No. 22-50782, 2024 WL 3861374 (5th Cir. Aug. 19, 2024), the Fifth Circuit upheld summary judgment on Union

Pacific's direct threat defense even where the plaintiff argued that Dr. Charbonneau disagreed with the assessment of "three medical professionals who personally examined" the plaintiff. The court held that "even if Dr. Charbonneau had disagreed with one of the other medical professionals, the direct threat analysis asks whether the employer made a 'reasonable medical judgment' — not whether every examining doctor came to the same exact conclusion." *Id.* at * 5.

Similarly, in *Vasquez v. Union Pacific Railroad Company*, No. 24-50852, 2025 WL 3034706, at *6 (5th Cir. Oct. 30, 2025), the court found that the plaintiff's treating providers did not create a genuine issue of material fact as to the direct threat defense because his "medical providers were not familiar with his essential job functions." The same is true here: neither Dr. Citta nor Dr. McKenzie was ever asked to evaluate whether Silos could safely return to his specific Track Laborer position, and neither did so.

Silos will present Dr. Trangle to the jury to second-guess Dr. Charbonneau's medical judgment. The Court should instruct the jury clearly that their role is not to decide which doctor made the better or more correct medical decision. If the jury is permitted to second-guess the substance of Dr. Charbonneau's medical judgment and choose Dr. Trangle's contrarian view instead, it effectively removes the medical judgment from the hands of a trained occupational physician with 30 years of railroad experience and places it with a jury of laypersons to second-guess after the fact. That is precisely what the "objectively reasonable" standard is designed to prevent. The Court's role — and by extension the jury's role — is limited to ensuring the "decision-maker has reasonably considered and relied upon sufficient evidence specific to the individual and the potential injury." *Knapp*, 101 F.3d at 484.

15

Union Pacific respectfully submits that if the Court properly instructs the jury in accordance with this standard, the record evidence of Dr. Charbonneau's thorough, individualized, and medically grounded determination will more than satisfy the objective reasonableness threshold, and the jury will find in Union Pacific's favor on the direct threat defense.

2.    Business Necessity

The ADA expressly provides an affirmative defense of job-relatedness and business necessity. Silos will undoubtedly argue that because his is a "disparate treatment" or intentional discrimination claim, the business necessity defense is unavailable to Union Pacific. That argument fails as a matter of law under controlling Eighth Circuit authority.

In *Belk v. Southwestern Bell Telephone Co.*, 194 F.3d 946 (8th Cir. 1999), the Eighth Circuit squarely addressed and rejected this precise contention. The plaintiff in *Belk* urged that his suit was based on "disparate treatment" and that the employer could not therefore raise the business necessity defense, citing Eighth Circuit precedent for the proposition that "no business necessity rule exists to absolve a defendant from liability for intentional discrimination."  The Eighth Circuit rejected that argument, holding that "as long as the theory behind the lack of accommodation is conceivably job-related, as claimed, then the employer should be entitled to raise the business necessity rule," and that the plaintiff could not "use the distinction between disparate treatment and disparate impact discrimination to argue against the possible application of the business necessity defense."

16

The *Belk* court held, among other things, that an employer "could raise business necessity defense notwithstanding employee's allegation that employer engaged in disparate treatment" and that the employer "was entitled to business necessity instruction."  The court further held that the district court's failure to provide the jury with such an instruction prejudiced the employer and required a new trial.

*Belk* thus stands for the clear proposition that the business necessity defense is available to a defendant in an ADA case even where the plaintiff frames his claim as one of intentional, disparate-treatment discrimination. That is precisely the posture of this case. Silos brings a § 12112(a) intentional discrimination claim under the ADA, and Union Pacific is entitled — under *Belk* — to present its business necessity defense to the jury. Additional support for this conclusion is found in *Brasier v. Union Pacific Railroad Company*, 2021 WL 6101432 (D. Ariz. July 20, 2021). In that case — another Union Pacific FFD case — the court acknowledged without question that the business necessity defense "may be asserted to defend against disparate treatment, disparate impact, and failure to accommodate claims under the ADA."  *Brasier* thus confirms the broad scope of the business necessity defense across all varieties of ADA discrimination claims, including the § 12112(a) intentional discrimination claim Silos pursues here.

        a.     The Elements of the Business Necessity Defense

As reflected in Union Pacific's proposed jury instruction, business necessity is an affirmative defense to a claim of discrimination under the ADA, and the verdict must be for Union Pacific if it has proved that the standard, criterion, or policy at issue satisfies four elements.  Specifically, the defense requires that the standard, criterion, or policy: (1) is uniformly applied; (2) is job-related for the Track Laborer position; (3) is consistent with

17

business necessity; and (4) cannot be met by the plaintiff because of his disability. If the jury finds that each of the elements on which the plaintiff has the burden of proof has been proved, but also finds that the defendant has proved this affirmative defense, the verdict should be for the defendant. The evidence at trial will establish all four elements of the business necessity defense.

### b. The Application of Union Pacific's FFD Qualification Standards Was Uniformly Applied.

The first element — uniform application — is readily satisfied. The fitness-for-duty process "entails a review of the pertinent and relevant medical records surrounding the reason for an employee's absence" to "determine if an employee is fit and able to work." Union Pacific applies this same process across its workforce. The FFD qualification standards at issue here — the safety-based physical requirements for Silos' Track Laborer position — are applied consistently to all employees in that role. There is no evidence, and Silos does not contend, that Union Pacific applied its FFD evaluation process or its physical qualification standards to Silos in a manner different from any other similarly-situated Track Laborer.

### c. The FFD Qualification Standards Are Job-Related to the Track Laborer Position.

The second element — job-relatedness — is also beyond serious dispute on this record. An employer urging a business necessity defense must validate the test or standard in question for job-relatedness to the specific skills and physical requirements of the sought-after position, and "an examiner must consider meaningful work-related information, including the type of activity to be performed [and] the level and duration of effort required." The physical qualification standards at issue here — the ability to

regularly climb, bend, stoop, crawl, kneel, stand for prolonged periods, and walk on uneven surfaces — are not abstract requirements invented by Union Pacific without regard to the actual demands of the position. They directly map onto the documented essential functions of the Track Laborer job. The evidence at trial will establish:

- During an average day, Silos was required to climb into and out of the front loader "more than 30 times," walk on uneven surfaces like the ballast surrounding the rail, and perform maintenance on his machine.

- Even while serving as a machine operator, Silos was expected to perform the functions of the Track Laborer position — in his own words, backhoe operators "still have to get out and help" maintain the track.

- Silos' responsibilities as a Track Laborer entailed clearing and maintaining railway track, including tasks like changing ties, cutting and changing rail, driving and pulling spikes, and carrying "OTM" — on-track material.

Union Pacific contends that the essential functions of Silos' Track Laborer position required him to regularly and repeatedly climb, bend, stoop, crawl, kneel, stand for long stretches, and walk on uneven surfaces.  These are not invented or pretextual requirements. They are the documented, daily physical demands of the position as confirmed by Silos' own testimony, the written job description, and Union Pacific's managerial witnesses.

The job-relatedness of the qualification standards is further confirmed by the testimony of Dr. Charbonneau, who drew an express connection between Silos' physical limitations and the specific, essential functions of his position. Based on Dr. Charbonneau's review of the medical records, his knowledge of patients with

femoroacetabular impingement, Silos' comments to the HMS nurse about his hip, the "specific observation[s] from [Silos's] management," Silos' weight, and the fact that Silos spent a "considerable period of time each day on his feet," Dr. Charbonneau issued work restrictions on March 30, 2020.  Those restrictions required Silos to avoid bending his knees, climbing, crawling, kneeling, standing for prolonged time, standing or walking on uneven surfaces, and walking for prolonged time.  Each of those restrictions corresponds directly to a physical demand that the Track Laborer position imposes daily.

> d. The FFD Qualification Standards Are Consistent with Business Necessity

The third element — consistency with business necessity — is satisfied by the overwhelming safety imperative that drove Union Pacific's FFD evaluation and the resulting qualification standards. The business necessity for the physical qualification standards applicable to the Track Laborer position is apparent from the nature of the work environment itself. This is not a case of office work or sedentary clerical duties. Silos worked in an active railroad environment, routinely climbing into and out of the front loader more than 30 times daily, walking on uneven surfaces like ballast surrounding the rail, and performing maintenance on heavy machinery.  The ability to do all of those things reliably, safely, and without sudden loss of balance or stability is not a luxury requirement — it is a fundamental prerequisite to working safely in an active rail yard environment.

Dr. Charbonneau testified that he imposed the restrictions because of a "concern that [Silos] might fall" and become injured given the "specific observations" from management that he had been "limping" or "staggering" at work.  Dr. Charbonneau "did not want to see [Silos] have an event at work secondary to his problem or any aggravation

of that underlying problem in his left hip," and Silos' "risk of tripping, falling, losing his balance ... in his work on even surfaces" was "the chief concern."

This is not mere overcautiousness. As the Eighth Circuit has recognized, where a physical standard or criterion is designed to prevent injury in a safety-sensitive work environment, business necessity is well-established. The physical qualification standards that screened Silos out of the Track Laborer role were developed and applied to address a genuine, documented, individualized safety hazard — not abstract concerns or stereotypes about employees with hip conditions generally.

The business necessity element is further supported by Union Pacific's exposure to liability under the Federal Employers' Liability Act if it knowingly places an employee with a documented, unstable physical condition in a safety-sensitive railroad position. Doing nothing in the face of all of this evidence would have endangered Silos himself, as well as his co-workers, and could well have exposed Union Pacific to serious liability. The ADA does not require an employer to "walk 'on a razor's edge — in jeopardy of violating the [ADA] if it fired such an employee yet in jeopardy of being deemed negligent if it retained him and he hurt someone.'" *Stern v. St. Anthony's Health Ctr.*, 188 F.3d 276, 295 (7th Cir. 2015).

> e. The Qualification Standard Cannot Be Met by Silos Because of His Disability.

The fourth and final element — that the standard cannot be met by Silos because of his disability — is conclusively established by the record, including Silos' own admissions. Dr. McKenzie determined that Silos had "moderately severe primary osteoarthritis secondary to acetabulum femoral impingement of the cam type" in his left hip, and was "almost touching bone to bone" at one place in that hip. These are not

21

conditions that could be managed by a simple modification of the work environment. The medical restrictions Dr. Charbonneau issued — no prolonged walking, no walking on uneven surfaces, no climbing, crawling, kneeling, or squatting — are the direct consequence of Silos' hip condition.

Most compellingly, Silos himself has admitted that he cannot meet the physical qualification standards of his position. His supervisor Hoffmaster concluded that Silos' restrictions interfered with and would require removal of the essential functions of Silos' job. Silos does not meaningfully dispute this. He did not request reassignment, did not pursue vocational assistance, and has acknowledged in his deposition that he is currently in too much pain from his hip to do the job at all.

> f.   The Jury Must Be Instructed on the Business Necessity Defense

The Eighth Circuit has held that when a defendant presents sufficient evidence to support the business necessity defense, the trial court is required to instruct the jury accordingly. This court has stated that "a business necessity instruction is crucial to the fair presentation of any employment discrimination case and must be given whenever proffered by the defendant." *Belk*, 194 F.3d at 952 (citations omitted).

Here, Union Pacific has presented substantial, particularized evidence in support of each element of the business necessity defense. As the Eighth Circuit emphasized in *Belk*, the trial court is not required to adopt the exact language suggested by the defendant, but is "simply required to adequately inform the jury of the substantive law regarding the business necessity defense." *Id.* at 953.

Union Pacific respectfully submits that the proposed jury instruction it submitted correctly states the applicable law and adequately informs the jury of the elements of the

22

defense. The instruction properly places the burden on Union Pacific to prove the four elements, and provides that — even if Silos has established the elements of his prima facie claim — a finding in Union Pacific's favor on the business necessity defense compels a verdict for Union Pacific. Union Pacific is entitled to a business necessity jury instruction, and the evidence presented at trial will amply sustain a verdict in Union Pacific's favor on that defense.

## IV.   CONCLUSION

The evidence presented at trial will establish that Union Pacific acted lawfully, reasonably, and in good faith when it issued medical restrictions to Phil Silos in 2020. Dr. Charbonneau — an occupational physician with over 30 years of railroad experience — conducted a thorough, individualized FFD evaluation, reviewed all available medical information, considered the specific demands of Silos' safety-sensitive position, and reached a medically grounded judgment that Silos could not safely perform the essential functions of his job without posing a direct threat to himself and his co-workers. Neither of Silos' own treating physicians actually evaluated or cleared him to safely perform the specific essential functions of his railroad position. Silos himself admits he cannot do the job today. The evidence does not support a finding of discriminatory intent, and the record establishes Union Pacific has established its direct threat and business necessity affirmative defenses.

Dated this 17th day of March, 2026.

UNION PACIFIC RAILROAD
COMPANY, Defendant,

By: /s/*Scott P. Moore*
  Scott P. Moore (NE # 20752)
  Danielle L. Rowley (NE# 25505)
of  BAIRD HOLM LLP
  1700 Farnam St, Ste 1500,
  Omaha, NE 68102-2068
  Phone: 402-344-0500
  Facsimile: 402-344-0588
  Email: spmoore@bairdholm.com
  Email: drowley@bairdholm.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF COMPLIANCE

I hereby certify that the word count function was applied to include all text, including the caption, headings, footnotes, and quotations. This document was prepared using Microsoft Word 2016 and contains 6,623 words. I also hereby certify the accuracy of all content provided by generative artificial intelligence, including all citations and legal authority.

/s/*Scott P. Moore*

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Nicholas D. Thompson: nthompson@caseyjones.law
Kathryn E. Averwater: kaverwater@caseyjones.law
Gracie L. Wendt: gwendt@caseyjones.law

/s/*Scott P. Moore*

7095182.1

24