**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEBRASKA**

| | |
|---|---|
| Phillip Silos,<br><br>                                      Plaintiff,<br><br>v.<br><br>Union Pacific R.R. Co.,<br><br>                                      Defendant. | Case No.: 8:23-cv-0113<br><br>**PLAINTIFF'S TRIAL BRIEF** |

This case is headed to trial on a straightforward question: did Union Pacific violate the ADA when it pulled long-time employee Phil Silos from service based on a claimed safety concern tied to his hip condition and limp. The Court has already pared the case down to a single § 12112(a) disability discrimination claim, with Union Pacific pressing "direct threat" as its real defense.

From here, three issues are likely to arise—and each one matters because it will shape what the jury hears and what legal framework the jury is told to apply.

First, Union Pacific is poised to litigate the "qualified" element, which plaintiffs must prove, as if it means "proves he was not a safety risk," which is not the law. The qualified element is not a backdoor vehicle for shifting Union Pacific's direct-threat burden onto a plaintiff. And the Court's summary-judgment order already recognized the problem with trying to cram "safety" into the plaintiff's prima facie case instead of treating it where it belongs—under Union Pacific's affirmative defense.

Second, Union Pacific appears likely to offer what is functionally expert medical opinion testimony—especially about why its doctors did what they did and whether the restrictions were medically grounded—despite disclosing no experts. That dispute is not academic; it affects what testimony is admissible, whether Rule 702 and Rule 26 apply, whether Rule 701 is being used as

a workaround, and whether Plaintiff is forced to defend against undisclosed opinion testimony at trial.

Third, Union Pacific is seeking to inject "business necessity" into this case as an affirmative defense that warrants a jury instruction, even though it has repeatedly framed its conduct as an individualized, case-by-case fitness-for-duty determination, not the application of a neutral policy that screens out a protected class. The result is a real risk of jury confusion, especially if Union Pacific is permitted to argue a narrative that essentially asks the jury to excuse noncompliance with the ADA because railroad work is dangerous.

What follows is intended to flag these issues early so they can be resolved cleanly, without mid-trial detours, shifting burdens, or instructions that invite the jury to decide the wrong question.

## 1) WHAT IT MEANS TO BE "QUALIFIED" AND WHY UNION PACIFIC'S FRAMING IMPROPERLY COLLAPSES DIRECT THREAT INTO PLAINTIFF'S CASE

The first likely trial issue is the meaning of "qualified"—because Union Pacific's trial brief makes clear it intends to treat qualification as the central battleground, and to equate "qualified" with "no safety risk." Def. Trial Br., Dkt. 99, 7-9. That framing is likely to come up early—during opening statements, during the testimony about the fitness-for-duty process, and again at the instruction conference—because it impacts burdens and what the jury is told Plaintiff must prove.

The elements Plaintiff are familiar in this Circuit: Plaintiff must show (1) he was disabled, (2) he was qualified, and (3) Union Pacific imposed work limitations because of his disability. Mem. and Order, Dkt. 71, 8 (citing *Sanders v. Union Pac. R.R. Co.,* 108 F.4th 1055, 1060 (8th Cir. 2024)). In this case, even Union Pacific's own trial brief acknowledges that disability and an adverse employment action are not really being contested for trial purposes. Def. Trial Br., Dkt. 99, 7-9. And the third element—causation in the basic sense that the restrictions were imposed because of the hip condition Union Pacific was evaluating—is likewise not where the real dispute

sits; Union Pacific's position is that it acted lawfully because it believed the condition created a safety problem, not that the condition played no role. *Id.* If the evidence comes in as anticipated, Plaintiff expects these points to be appropriate for Rule 50 treatment because they are not meaningfully disputed as elements.

The remaining element, "qualified," is something Union Pacific will attempt to transform into a direct-threat inquiry. That is apparent from its stated position that—because the failure-to-accommodate claim was dismissed—Plaintiff must prove he can perform the essential functions of the job without considering a reasonable accommodation, and then from its insistence that ability to do his job safely is itself an essential function. Def. Trial Br., Dkt. 99, 7-9.

There are two problems with that approach—one legal and one practical.

Legally, the Eighth Circuit recognizes the basic two-part "qualified" inquiry: whether the employee has the requisite skill, education, experience, and training, and whether he can perform the job's essential functions (with or without accommodation, depending on the claim posture). Mem. and Order, Dkt. 71, 9 (citing *Goosen v. Minnesota Dep't of Transportation*, 105 F.4th 1034, 1040 (8th Cir. 2024)). But safety-based arguments—particularly arguments that the employee posed a danger—do not belong inside the prima facie case as a way to shift burdens. The Court's summary-judgment order already addressed this exact point: Union Pacific's real argument on qualification was safety, and an employer's safety concerns are not part of the prima facie case for disability discrimination; rather, whether an individual poses a danger to himself or others goes to the employer's direct threat affirmative defense, on which the employer bears the burden. Mem. and Order, Dkt. 71, 12 (citing, *inter alia*, *Jackson v. Union Pac. R.R. Co.*, 2021 WL 1726895, at *15 (S.D. Iowa Mar. 29, 2021)). That is the clean framework, and it matters at trial because it prevents the defense from quietly moving its burden onto Plaintiff through the "qualified" label.

Practically, Union Pacific's own factual narrative shows why this "qualification-as-direct-threat" pivot is so tempting—and why it is improper. It wants to argue that Silos is unqualified because it believed he might fall, lose balance, or otherwise be unsafe. Def. Trial Br., Dkt. 99, 7-9. But that is direct-threat territory: it is inherently predictive; it is inherently medical; and it is exactly why the law requires an individualized, objective, evidence-based analysis before an employer can sideline a disabled worker based on fear rather than facts. Mem. and Order, Dkt. 71, 13–15 (citing, *inter alia*, *Equal Emp. Opportunity Comm'n v. Drivers Mgmt., LLC*, 142 F.4th 1122, 1133 (8th Cir. 2025)).

Union Pacific's effort to load safety into qualification is also why it injects collateral "safety" facts into the case that are not medically connected to the claimed impairment. For example, raises a December 2019 backhoe incident in its trial brief and then attempts to tie that to hip-related concerns, even though no one has tied that incident to in any way to Silos's hip condition, much less to the question at issue in this case: whether his hip condition created a significant risk of substantial harm. Def. Trial Br., Dkt. 99, 1, 4. If that episode becomes a theme at trial without a medical foundation connecting it to the asserted impairment-based risk, the Court is likely to face disputes about relevance and unfair prejudice that distract from the actual legal question: what was objectively reasonable for Union Pacific to believe, based on the best available objective evidence, at the time it acted.

The governing law supports keeping the lanes clear. Direct threat is an affirmative defense; it asks whether the employee posed a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation, and it must be evaluated through an individualized analysis grounded in the best current medical or other objective evidence—not stereotypes or

unfounded fear. Mem. and Order, Dkt. 71, 13–15 (citing, *inter alia*, *Drivers Mgmt.*, 142 F.4th at 1133).

Union Pacific will likely respond that safe performance is always part of essential functions, and therefore part of qualification. But even if safety can be relevant to essential functions in some contexts, the Court's order already recognized that Union Pacific's particular safety argument is a poor fit for the prima facie case here, because it is not an "unable to perform tasks" argument—it is a risk argument. Mem. and Order, Dkt. 71, 12 (citing, *inter alia*, *Jackson*, 2021 WL 1726895, at *15). That distinction matters. Treating every predictive safety concern as qualification would erase the direct-threat framework, erase the employer's burden, and erase the requirement of objective medical grounding that protects disabled workers from exclusion based on fear.

For those reasons, Plaintiff anticipates the need for an instruction and trial management approach that keeps "qualified" tethered to its proper definition and prevents the direct-threat defense from being smuggled into Plaintiff's case through burden-shifting rhetoric. This case should be tried on what it actually is about: Union Pacific's affirmative defense, that it reasonably concluded Silos posed a direct threat—not on an inverted framework where Silos must disprove a safety defense as part of proving he was qualified.

## 2) UNION PACIFIC'S LIKELY ATTEMPT TO OFFER EXPERT OPINION TESTIMONY DESPITE DISCLOSING NONE.

The second likely issue is evidentiary, but it will affect the heart of Union Pacific's defense: Union Pacific appears positioned to offer expert opinion testimony—especially medical opinions about risk, functional limitation, and what restrictions were medically grounded—while having disclosed no experts under Rule 26(a)(2).

The Court's Amended Case Progression Order set expert disclosure deadlines for retained and non-retained experts, including Rule 26(a)(2)(C) disclosures for non-retained/hybrid experts. Am. Case Progression Order, Dkt. 30, 1. The Order also squarely addresses treating providers: even though treaters are not always specially retained, their opinion testimony is limited to what is stated in treatment documentation, and any opinions not stated in the records must be separately and timely disclosed. *Id.* That warning is unusually direct, and it is directly implicated by how Union Pacific previews its proof.

Despite the warning, Union Pacific disclosed no expert opinions, and yet it has effectively disclosed that it intends to rely on medical judgment—*i.e.*, opinion—rather than mere chronology of what happened. It touts Dr. Charbonneau as an occupational physician with over 30 years of railroad experience, and it tells the Court the evidence will show he reached a medically grounded judgment that Silos could not safely perform the job without posing a direct threat. Def. Trial Br., Dkt. 99, 2, 23. That is not mere fact testimony about what forms were reviewed or what the restriction letter said. It is exactly the sort of specialized medical inference and risk assessment that triggers Rules 702 and 26(a)(2), particularly when it is offered to persuade the jury that the restrictions were objectively reasonable and that the direct-threat standard is met.

Union Pacific is also previewing testimony from medical providers and witnesses in ways that sound in medical causation and prognosis. For example, it asserts that treating provider testimony confirms ongoing risk and the likelihood of certain failures of balance or mobility based on hip pathology—again, classic expert territory. Def. Trial Br., Dkt. 99, 12. Those opinions might be admissible if they were formed during treatment and memorialized in treatment records (and were timely disclosed as the progression order contemplates), but the Court is likely to confront attempts to elicit broader, litigation-driven opinions: opinions about safe performance of railroad-

specific tasks, risk of falls in ballast environments, what restrictions should have been issued, and whether Union Pacific's process met regulatory standards. Those are not lay opinions, and they are not automatically admissible simply because the witness happens to be a doctor.

The legal standard is familiar. Rule 701 does not allow a party to present specialized medical reasoning dressed up as "what I thought" if the reasoning depends on scientific, technical, or other specialized knowledge within Rule 702. And Rule 37(c)(1) gives the Court a straightforward remedy when Rule 26(a)(2) disclosures are not made: exclusion, absent a showing of substantial justification or harmlessness. The point is not to create a side trial about labels. The point is to protect the integrity of the trial process: expert opinions are disclosed so the opponent can prepare—take discovery with the correct lens, retain rebuttal experts if needed, and raise Daubert/Rule 702 challenges on a schedule that allows reasoned rulings rather than last-minute firefights.

Union Pacific will likely respond that Dr. Charbonneau and the treating providers are fact witnesses because they participated in events. There is a kernel of truth there: they can testify to what they did, what records they reviewed, what they observed, and what they documented. But that does not mean they can do, at trial, what the expert disclosure rules are designed to regulate—offer specialized medical opinions to prove objective reasonableness, predict risk, justify restrictions, and establish that Plaintiff was a direct threat, without the disclosures and guardrails the Court ordered.

### 3) BUSINESS NECESSITY AND WHY IT DOES NOT FIT THE FACTS OF THIS CASE OR WARRANT A JURY INSTRUCTION

The third issue is less likely to erupt in the middle of live testimony, but it is already looming because it arises from Union Pacific's proposed instructions and its trial brief: Union Pacific is seeking a business-necessity instruction and treating business necessity as a freestanding

affirmative defense that can carry the verdict even if Plaintiff proves the elements of his claim. Def. Trial Br., Dkt. 99, 21–22.

Business necessity has a place in employment law, including in ADA litigation, but it has a specific logic. It is designed for cases involving a rule, test, selection criterion, or other qualification standard that screens out disabled people and is defended as job-related and consistent with business necessity. That is why, conceptually, it most naturally fits disparate-impact or qualification-standard cases where the employer concedes (or the evidence shows) the standard excludes, but argues the standard is justified. It is not a natural fit for a case the employer insists was individualized, where the employer's theory is "we evaluated this person, this medical information, and this risk, and we reasonably concluded he was unsafe." That theory is direct threat. Mem. and Order, Dkt. 71, 12–15 (citing, *inter alia*, *Drivers Mgmt.*, 142 F.4th at 1133).

Union Pacific has repeatedly framed this matter as an individualized fitness-for-duty assessment—indeed, it emphasizes the thorough, individualized nature of the evaluation as a reason the jury should find for the defense. Def. Trial Br., Dkt. 99, 11. Once the case is framed that way, "business necessity" does not add clarity; it adds a second, overlapping defense with different phrasing that risks diluting the direct-threat requirements the ADA uses to police safety exclusions. In other words, business necessity becomes a way to win on generalized safety rhetoric ("railroads are dangerous," "this is not an office job," "safety is a paramount business imperative") without satisfying the more demanding legal standard that requires objective evidence, individualized assessment, and a showing of significant risk of substantial harm.

That risk of jury confusion is heightened by the way Union Pacific is already arguing the case. It explicitly urges that the jury must be instructed on business necessity and quotes broad language suggesting the instruction is crucial whenever proffered. Def. Trial Br., Dkt. 99, 21–22.

But whether an instruction is crucial depends on whether the defense actually fits the claim and the facts being tried.

Here, Plaintiff is not challenging a neutral written policy that screens out disabled workers; Plaintiff challenges the removal from service and the restrictions imposed on him based on an asserted, individualized safety concern. That is exactly why the Court's summary-judgment order treated the safety dispute as a direct-threat issue, not as part of the prima facie case and not as a standard-validation question. Mem. and Order, Dkt. 71, 12 (citing, *inter alia*, *Jackson*, 2021 WL 1726895, at *15).

Union Pacific will likely argue that its fitness-for-duty criteria are qualification standards uniformly applied and therefore business necessity fits. Def. Trial Br., Dkt. 99, 16-23. But that framing is itself the problem: it attempts to rebrand an individualized direct-threat decision as a neutral standard, and then it uses that rebranding to justify a business-necessity instruction that would let the jury decide the case on a generalized sense that railroad work is hard and safety is important. The ADA already accounts for safety concerns through direct threat; the question is whether Union Pacific met that standard here. Mem. and Order, Dkt. 71, 13–15 (citing, *inter alia*, *Drivers Mgmt.*, 142 F.4th at 1133).

This is also where the "FELA catch-22" theme may surface. Union Pacific wants to argue that it is stuck between the ADA and FELA, and therefore deserves leeway: if it leaves a worker on the job, it risks injury and liability; if it removes the worker, it is sued under the ADA. But that is not a legal defense. What matters is whether Union Pacific complied with the ADA's requirements for excluding a disabled worker on safety grounds. The ADA does not contain a "take pity on the employer because other laws exist" exception, and permitting that argument to drive

instructions invites the jury to decide the case based on sympathy for the employer's regulatory environment rather than on whether the statutory standard was met.

For these reasons, Plaintiff expects business necessity to arise as a jury-instruction dispute, and Plaintiff's position is that the Court should not give a business-necessity instruction in this individualized removal-from-service case. The jury should be instructed on the elements of the § 12112(a) claim and, if supported by admissible evidence, on direct threat as the safety-based affirmative defense—without layering on an additional defense that does not fit the claim being tried and risks collapsing the direct-threat inquiry into generalized "safety is important" reasoning.

**PLAINTIFF'S COUNSEL**

March 17, 2026

/s/ Nicholas D. Thompson
Nicholas D. Thompson (MN0389609)
Kathryn E. Averwater (MN0401767)
CASEY JONES LAW
323 N. Washington Ave, Suite 200
Minneapolis, MN 55401
Phone: (612) 293-5370
Email: nthompson@caseyjones.law
Email: kaverwater@caseyjones.law